AO 91 (Rev. 11/11) Criminal Complaint            AUSA Mary McDonnell (312) 370-4314


FILED
3/31/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

ROGELIO CASTANEDA

CASE NUMBER: 23 CR 188

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. From on or about February 7, 2023, to on or about March 20, 2023, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 922(a)(1)(A) | willfully engaged in the business of manufacturing and dealing in firearms without a license |
| Title 18, United States Code, Section 922(o) | unlawfully possessed and transferred a machine gun. |

This criminal complaint is based upon these facts:

 X   Continued on the attached sheet.

                                                        Samuel Brienzo by MV
                                                        SAMUEL BRIENZO
                                                        Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: March 31, 2023                                    *Judge's signature*

City and state: Chicago, Illinois                 MARIA VALDEZ, U.S. Magistrate Judge
                                                                        *Printed name and title*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, Samuel Brienzo, being duly sworn, state as follows:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and have been so employed since approximately May 2022. My current responsibilities include the investigation of violent crimes and federal firearms offenses.

2. This affidavit is submitted in support of a criminal complaint alleging that ROGELIO CASTANEDA has violated Title 18, United States Code, Section 922(a)(1)(A) (unlawful firearms trafficking) and Title 18, United States Code, Section 922(o) (unlawful possession of a machine gun).

3. The facts set forth in this affidavit are based on my personal knowledge, my training and experience, my review of certain reports and video footage, information provided to me by various law enforcement personnel and witnesses, and the training and experience of other law enforcement officers with whom I have spoken.

4. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint and search warrants, I have not included every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause.

**I.    APPLICABLE LAW**

5. Title 18, United States Code, Section 922 (o) makes it unlawful for any person to possess or transfer a machinegun.

6. Title 18, United States Code, Section 921(a)(24), defines the term "machinegun" as having "the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b))."

7. Title 26, United States Code, Section 5845(b), defines "machinegun" as, "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

## II. SUMMARY OF PROBABLE CAUSE

8. In summary, ATF is conducting a criminal investigation of Rogelio CASTANEDA regarding possible violations of the above listed offenses. Specifically, as described below, between approximately February 7, 2023, and March 20, 2023, CASTANEDA, communicated with individuals who, unbeknownst to CASTANEDA, were ATF undercover agents ("UC-1" and "UC-2") about selling firearms. During communications with UC-1, CASTANEDA discussed the sale of several firearms, including the sale of machinegun conversion devices also known as "switches" or "buttons." Between February 7, 2023, and March 20, 2023, UC-1 purchased a total of

four firearms and nine machine gun conversion devices from CASTANEDA on four occasions.

9. Based on my review of CASTANEDA's criminal history, I know that CASTANEDA was indicted in the Circuit Court of Cook County, Illinois on July 3, 2022, with three counts of aggravated unlawful use of a weapon, a felony offense and remains under indictment.

## II. FACTS SUPPORTING PROBABLE CAUSE

### A. February 7, 2023, Firearm Sale

10. According to UC-1 and my review of UC-1's text messages, from on or about February 6, 2023, to on or about February 7, 2023, UC-1 exchanged several text messages with (773) XXX-9260 (hereinafter, "Castaneda Phone") to arrange the purchase of a firearm.[1]

11. According to UC-1 and my review of UC-1's text messages, on or about February 6, 2023, at approximately 8:02 p.m., UC-1 sent a text message to the Castaneda Phone stating, "Wtw [what's the word] for tomorrow."[2] UC-1 then received

---

[1] The identification of CASTANEDA as the user of the Castaneda Phone in this affidavit is based on the following: 1) According to T-Mobile, the Castaneda Phone is subscribed to Rogelio Castaneda at an address on the 5200 block of S. Hermitage Avenue in Chicago, Illinois; 2) As described throughout this affidavit, UC-1 communicated with the user of the Castaneda Phone to arrange firearms transactions on or about February 7, 2023, February 22, 2023, March 5, 2023, and March 20, 2023, and CASTANEDA arrived; and 3) UC-1 was presented with a known law enforcement photograph of CASTANEDA and UC-1 identified CASTANEDA as the person who arrived at the firearms transactions.

[2] At various points in this affidavit, I will offer my understanding and interpretation of certain statements, including intercepted or recorded conversations, in bracketed comments or during the description of the conversation. My understanding and/or interpretation of these conversations is based upon the contents of the conversations, the context of both prior and subsequent conversations, information received from confidential sources and other law enforcement officials, my knowledge derived from this investigation, and my experience and

a text message from the Castaneda Phone stating, "I got the .45 [caliber firearm] jst waitin on the response about the other 2."

12. On or about February 7, 2023, at approximately 8:36 a.m., UC-1 sent a text message to Castaneda Phone stating, "Yo yo todo bien bro." Later that same day, at approximately 10:01 a.m., UC-1 received a text message from Castaneda Phone stating, "Yes sit I got the 45." UC-1 received a text message from the Castaneda Phone stating, "[number of address on 5200 block of] s hermitage ave."[3]

13. According to UC-1 and my review of UC-1's text messages, on or about February 7, 2023, at approximately 10:40 a.m., UC-1 sent a text message to the Castaneda Phone stating, "Pulling up." Law enforcement observed CASTANEDA exit Castaneda's residence and enter the rear passenger seat of UC-1's vehicle. According to UC-1 and audio/video recordings, once inside the vehicle, CASTANEDA handed a silver pistol to UC-1. UC-1 then handed CASTANEDA $1,400. CASTANEDA stated that he drove down to Texas and "spent $2,500 on five Glocks and made $7,000." CASTANEDA then took out a phone and showed UC-1 a website that advertised firearms for sale in Texas.

---

familiarity with firearms trafficking. Except as noted, the summaries of conversations contained in this affidavit that occurred in relation to the controlled purchase of firearms represent a review of the audio and video recordings and do not represent finalized transcripts of the conversations and may not represent the entire conversation that occurred between the identified individuals

[3] The identification of 5249 S. Hermitage Avenue as Castaneda's Residence is based on the following: 1) according to a law enforcement database and law enforcement reports in which CASTANEDA had provided a residence, CASTANEDA resides at 5249 S. Hermitage Avenue; 2) according to service provider subscriber records, the Castaneda Phone is subscribed to CASTANEDA at 5249 Hermitage Avenue.

14. The silver pistol CASTANEDA handed UC-1 was later identified as a Ballester Molina Model Hafdasa .45 Caliber pistol containing eight .45 caliber rounds of ammunition.

**B. February 22, 2023, Firearm Sale**

15. On or about February 22, 2023, UC-1 and UC-2 met with CASTANEDA to purchase firearms. According to UC-1, and my review of UC-1's text messages, UC-1 and CASTANEDA arranged a date for the transaction through messages and phone calls that took place between the dates of February 8, 2023, and February 22, 2023.

16. On or about February 16, 2023, at approximately 3:06 p.m., according to UC-1 and my review of UC-1's text messages, UC-1 received a text message from Castaneda Phone that included a video depicting what appeared to be a Glock firearm with a machine gun conversion device, also known as a "switch," installed. UC-I received a text message from Castaneda Phone stating, "[$]1900." UC-1 sent a message to Castaneda Phone stating, "Damn 19 high [expensive] bro." UC-1 received a text message from Castaneda Phone stating, "lowest hell do is [$]1800 he said but idk [I don't know]."

17. According to UC-1, on or about February 18, 2023, at approximately 11:25 a.m., UC-1 received a text message from the Castaneda Phone that included a photo of what appeared to be a Glock 31 firearm and stated, "[$]1300." UC-1 received a text message from the Castaneda Phone with a photo of what appeared to be a Glock firearm with a "switch" installed and stated, "[$]1700." UC-1 responded to the

5

Castaneda Phone stating, "Ight bet I'm out west but hyu [hit you up] when I'm back in the city bro."

18. According to UC-1 and my review of UC-1's text messages, on or about February 19, 2023, at approximately 4:35 p.m., UC-1 received a text message from Castaneda Phone that included a photo of what appeared to be a brown Canik firearm and stated, "[$]1100." UC-1 sent a text message to the Castaneda Phone stating, "Might not be back until Wednesday." UC-1 received a text message from Castaneda Phone stating, "I can hold dis ne till den if u wnt it."

19. According to UC-1 and my review of UC-1's text messages, on or about February 21, 2023, at approximately 12:58 p.m., UC-1 sent a text message to the Castaneda Phone stating, "Yo yo u still got those [firearms]? I can come thru tomorrow got my bro getting bread [money] together now I be back tonight." UC-1 received a text message from Castaneda Phone stating, "Both .357s [Glock model 357 SIG] that i had gone, but my guy got another one brand new in the box literally brand new no scratches notin but he wants [$]1400 for that one and i got the gold and black one too i told u i was gnna hold for u. And den my other guy from Stickney his guys got a foldable glock 40."

20. According to UC-1 and my review of UC-1's text messages, at approximately 1:50 p.m., UC-1 received a text message from the Castaneda Phone that stated, "Ok bad news my guys brother just literally sold the 2 long ones." UC-1 received a text message from Castaneda Phone stating, "So we got the canik nd the glock 357 lmk [let me know]". UC-1 messaged the Castaneda Phone stating, "Canik

6

and 357 straight." UC-s received a text message from the Castaneda Phone stating, "So u want the canik nd 357 den?" UC-1 messaged the Castaneda Phone stating, "Yeah."

21. Later that same day, at approximately 6:33 p.m., UC-1 received an additional text from the Castaneda Phone which stated, "my guy got buttons [machinegun conversion devices] for Glocks metal ones." UC-1 received a text message from Castaneda Phone stating, "Lmk $400 each [conversion device]." UC-1 sent a text message to Castaneda Phone stating, "oh yeah I seen these but $400 is taxing bro." UC-1 received a text message from Castaneda Phone stating, "He might do $350 each but that's probably the lowest hell go on these, if it was the ones wit the button [conversion device] those usually b like [$]250 i think." At approximately 8:06 p.m., UC-1 received a text message from Castaneda Phone stating, "He said the only way hell do $350 if we get 2 of them." UC-1 responded to the Castaneda Phone by stating, "I can do the 2."

22. On or about February 22, 2023, according to UC-1 and my review of UC-1's text messages, at approximately 11:36 a.m., UC-1 received a text message from Castaneda Phone stating, "U still comin for switch nd orher 2" and "I mean the 2 switches and 2 pipes [pistol]." UC-1 sent a text message to Castaneda Phone stating, "Can't talk rn [right now] but ya 2 [firearms] and 2 [switches]." UC-1 received a text message from Castaneda Phone stating "Ok lmk [let me know] wen you on your way so I can have my guy drop me off dem switches."

7

23. Prior to the meeting the undercover vehicle ("UCV") was equipped with audio and video recording equipment. At approximately 1:48 p.m., UC-1 and UC-2, occupying the UCV, arrived to the 5200 block of S. Hermitage Ave., in Chicago and parked on the street. According to UC-1 and my review of UC-1's text messages, UC-1 sent a text message to the Castaneda Phone stating, "Here." UC-1 then observed CASTANEDA exit his residence, walk toward the UCV, and enter the back passenger seat of the UCV. According to UC-1, once CASTANEDA was in the UCV, he retrieved a black plastic Glock firearm case from underneath his hooded sweatshirt. CASTANEDA informed the UCs, "My guy coming down Ashland with the switches." CASTANEDA then handed a case to UC-1 and stated that both the Glock and the Canik firearms were in the case. UC-2 retrieved the Glock pistol and inspected it. As UC-1 retrieved and inspected the Canik firearm, CASTANEDA stated "that was my brother's shit." UC-1 handed CASTANEDA $1200 for the Canik pistol and UC-2 handed CASTANEDA $1800 for the Glock pistol.

24. According to the UCV recording, UC-1 showed CASTANEDA a video of a machinegun conversion device UC-1 installed on a Glock pistol and firing fully automatically. As CASTANEDA watched the video, CASTANEDA stated, "that's with a Glock switch." UC-2 then asked CASTANEDA if he knew how to install "switches." CASTANEDA replied "yeah, hell yeah." UC-1 then asked CASTANEDA about the "switches" they were waiting to purchase. CASTANEDA explained that the "switches" didn't have a "button," which UC-1 understood to refer to a selector switch which regulates the firearm to operate automatically or semiautomatically.

8

CASTANEDA further explained "what makes the gun fully auto is the little stick that goes inside not the button… the button is just to make it from semi to full." CASTANEDA assured UC-1 that the "switches" would operate fully automatically. CASTANEDA then pointed at the Glock firearm and stated, "we already had a switch on this one… that bitch blows." CASTANEDA further explained that it was a "switch" without the "button."

25. According to the UCV recording, UC-1 asked CASTANEDA "with this one… once you pull it – that's it?" CASTANEDA replied, "yeah it's full auto, that's it… you don't got the option to turn it off or turn it on that's it. That's why I don't keep one on top of the head." CASTANEDA explained to the UC's that the switches they were purchasing "are the new ones that are coming out and are more discrete… they work, we got two of those out there right now." UC-2 then asked CASTANEDA if his "boy" could get more switches. CASTANEDA confirmed and stated that he gets the "switches" from Indiana and brings them back to Chicago. CASTANEDA then told UC-1 that the individual with the "switches" is the same person selling the "300 blackout" rifle.

26. According to UCV recording, CASTANEDA stated that he would be traveling to Houston, Texas within the next month. CASTANEDA stated that he would be returning "with some shit" and further stated that had driven to Texas on multiple occasions. CASTANEDA stated that once the "switches" were installed on to the firearm, they "look like a regular back plate… it saves you from police. If a motherfucker was to get popped off [arrested] with it." CASTANEDA stated that the

9

company Glock does not actually make "switches" and whoever makes them will stamp them with the Glock logo. CASTANEDA further stated that he was interested in purchasing both "switches" and binary triggers in Texas.

27. According to law enforcement surveillance and UC-1, at approximately 2:08 p.m., a white Ford Expedition SUV arrived and parked in the street behind the UCV. CASTANEDA stated that it was the individual delivering the "switches." CASTANEDA exited the UCV, walked to the front passenger side of the Expedition, and opened the door. UC-1 observed CASTANEDA reach into the SUV and retrieve an object. UC-1 then observed CASTANEDA return to the UCV and get into the back seat. CASTANEDA then handed UC-1 what appeared to be two "switches." As UC-1 inspected the "switches," CASTANEDA offered to install one of them on to the Glock pistol the UC had just purchased from CASTANEDA. UC-1 declined CASTANEDA's offer and informed CASTANEDA that they knew how to install them. CASTANEDA stated that if the "switches" didn't operate correctly, CASTANEDA would give UC-1 the money back. CASTANEDA told UC-1 if they had any trouble installing the "switch," UC-1 could call CASTANEDA and he would help them install it over the phone. CASTANEDA again explained the process of installing the "switches" and stated, "As soon as I get some more I'll send you pictures."

28. Following the transaction, law enforcement determined that CASTANEDA had sold UC-1 a Canik55 model TP-9DA 9mm firearm and a Glock model 32 .357 caliber firearm along with nine .357 caliber rounds of ammunition. Law enforcement recovered the two machine gun conversion devices which were

submitted for examination at the ATF Firearms and Ammunition Technology Division as Exhibit 16 and Exhibit 17. According to the examination report:

> a. Exhibit 16 is a 3D printed machinegun conversion device commonly referred to as a Glock Chip. It is a device designed and intended to convert a semiautomatic, Glock-type pistol into a machinegun by utilizing an extended "leg" to push the trigger bar down and out of engagement with the firing pin as the slide closes, releasing the partially retracted firing pin to travel forward and fire a cartridge. When the trigger is depressed, this device enables a Glock pistol to shoot automatically more than one shot, without manual reloading, by a single function of the trigger. The examiner installed Exhibit 16 onto a Glock pistol, selected the automatic position on Exhibit 16, and test-fired five rounds of ammunition at once. All five rounds were fired automatically with manual reloading, by a single function of the trigger. Exhibit 16, in and of itself, is a part designed and intended solely and exclusively, for use in converting a weapon into a machinegun; thus, Exhibit 16 is a "machinegun" as defined in 26 U.S.C. § 5845(b) and 18 U.S.C. § 921(a)(24).
>
> b. Exhibit 17 is a 3D printed machinegun conversion device commonly referred to as a Glock Chip. It is a device designed and intended to convert a semiautomatic, Glock-type pistol into a machinegun by utilizing an extended "leg" to push the trigger bar down and out of engagement with the firing pin as the slide closes, releasing the partially retracted firing pin

11

to travel forward and fire a cartridge. When the trigger is depressed, this device enables a Glock pistol to shoot automatically more than one shot, without manual reloading, by a single function of the trigger. The examiner installed Exhibit 17 onto a Glock pistol, selected the automatic position on Exhibit 17, and test-fired five rounds of ammunition at once. All five rounds were fired automatically with manual reloading, by a single function of the trigger. Exhibit 17, in and of itself, is a part designed and intended solely and exclusively, for use in converting a weapon into a machinegun; thus, Exhibit 17 is a "machinegun" as defined in 26 U.S.C. § 5845(b) and 18 U.S.C. § 921(a)(24).

**C. March 5, 2023, Firearm Sale**

29. According to UC-1 and my review of UC-1's text messages, on or about March 4, 2023, at approximately 1:59 p.m., UC-1 received a text message from Castaneda Phone stating, "That 300 blackout [rifle] uo for sale again my lil brother had grabbed it but he got locked up yesterday so now he want me to sell it to money to bond him out." UC-1 and CASTANEDA agreed to meet the following day. On or about March 5, 2023, at approximately 10:49 a.m., UC-1 received a text message from Castaneda Phone stating, "Today around 1-2 [pm] right?" UC-1 confirmed that they would meet CASTANEDA later that day.

30. Prior to the meeting UC-1 and the UCV were equipped with audio and video recording. At approximately 1:47 p.m., UC-1 arrived at approximately 53rd and Hermitage Ave. and parked on Hermitage Ave. Upon arrival, UC-1 observed

CASTANEDA standing outside on the sidewalk on the east side of Hermitage Ave. UC-1 observed CASTANEDA walk to his residence on the 5200 block of S. Hermitage Ave. open the front door and enter the residence. Shortly after, CASTANEDA exited his residence carrying a black duffle bag. CASTANEDA crossed the street, approached the UCV, and got into the front passenger seat of the UCV.

31. According to UC-1 and the recording, once CASTANEDA was in the UCV, he retrieved a silver "300 Blackout" rifle from his black duffle bag. UC-1 inspected the firearm which appeared to be a personally made firearm (PMF). CASTANEDA handed UC-1 a loaded magazine and UC-1 handed CASTANEDA the ATF funds for the firearm. CASTANEDA stated, "the Glocks should be coming in like four days." UC-1 asked CASTANEDA how many Glocks he'd be receiving. CASTANEDA stated, "six/seven of them coming in." UC-1 asked CASTANEDA about the price for the Glocks. CASTANEDA stated, "he [unknown individual] gets them to see how brand new they look… then he'll let me know on the price." CASTANEDA then stated "he got some buttons [machinegun conversion devices] coming in." UC-1 informed CASTANEDA that he had installed one of the devices the UC had previously purchased from CASTANEDA. UC-1 told CASTANEDA that it operated correctly but they were worried about it melting since it was plastic. CASTANEDA stated, "it's polymer… it should not melt at all… my guy said if it melts, bring it back and I can get your bread [money] back." CASTANEDA stated that he would also have ARs [Armalite Rifles] in the future. At approximately 1:50 p.m., CASTANEDA exited the UCV and crossed the street. UC-1 departed the area.

32. Following the transaction, law enforcement determined that CASTANEDA had sold UC-1 an unknown manufacturer and unknown model AR style pistol, which appeared to be a privately made firearm along with 12 .300 caliber blackout rounds of ammunition.

**D. March 20, 2023, Firearm Sale**

33. According to UC-1 and my review of UC-1's text messages, on or about March 20, 2023, UC-1 conducted a firearms purchase from CASTANEDA, which was arranged through a series of messages and phone calls.

34. According to UC-1 and my review of UC-1's text messages, on or about March 14, 2023, at approximately 8:45 p.m., the Castaneda Phone sent UC-1 a text message including a photo of what appeared to be several machinegun conversion devices for purchase. On or about March 15, 2023, UC-1 sent a text message to the Castaneda Phone and informed him that UC-1 was out of town but was interested. UC-1 received a text message from Castaneda Phone stating, "How many u need." UC-1 responded, "What the ticket [price]?" UC-1 received a text message from Castaneda Phone stating, "$350 each remember but grab more then 2-3 then hi might go down 50." UC-1 responded, "If he come down can come thru for what he got left can get with my bro start getting brad straight." UC-1 received a text message from Castaneda Phone stating, "Yeah if u get more then 3 hell do [$]300 each." UC-1 agreed to purchase the machinegun conversion devices the following week. On March 19, 2023, at approximately 1:38 p.m., UC-1 received a text message from Castaneda Phone stating, "I need to know if u r going to grab these switches for sure or not." UC-

14

1 received a text message from Castaneda Phone stating, "Cus my guy keep askin me about it." UC-1 received a text message from Castaneda Phone stating, "He got 7 of dem. U gnna want all 7 or jst the 5." UC-1 sent a text message stating, "He come down I cop the 7." The Castaneda Phone responded to UC-1 via text stating, "He said since we been shopping wit him hell do dem at 280 a pop if you grab all 7." UC-1 responded to the Castaneda Phone, "Ight bet I can do the 7 if u be ready by 2."

35. According to UC-1 and my review of UC-1's text messages, on or about March 20, 2023, at approximately 10:17 a.m., UC-1 received a text message from Castaneda Phone stating, "You going to be here by 2pm, right bro?" UC-1 confirmed they would meet CASTANEDA later that day. At approximately 2:01 p.m., UC-1, while traveling in a UCV equipped with audio and video recording, arrived in the area of CASTANEDA's residence and parked on the east side of the street. UC-1 then observed CASTANEDA exit his residence and walk across the street toward a white Ford Expedition SUV, which appeared to have two occupants in the front driver and passenger seat. UC-1 observed CASTANEDA approach the front passenger who handed CASTANEDA a white envelope. CASTANEDA walked to the UCV and got into the front passenger seat. Once CASTANEDA was in the UCV, he retrieved a white envelope from his hooded sweatshirt pocket. The envelope contained seven "switches" which CASTANEDA counted out in front of UC-1. CASTANEDA placed the envelope and its contents on the center console of the UCV and UC-1 handed CASTANEDA the ATF funds. UC-1 then retrieved the envelop and inspected the "switches" verifying that there were seven devices inside.

15

36. According to UC-1 and the recordings, once CASTANEDA finished counting the money, UC-1 told CASTANEDA that he knew some individuals interested in purchasing "switches." CASTANEDA stated, "if you want to put an order in, I could tell him… he always grabs them from Indiana and I can tell him." UC-1 informed CASTANEDA that their family had a shop in Indiana and they could conduct future firearms transactions there. UC-1 further explained that the individuals interested in purchasing "switches" haven't been able to find them for less than $600.00. UC-1 told CASTANEDA they could both make a profit if they sold "switches" to the individuals. UC-1 explained to CASTANEDA that all he would have to do is show them how to install the "switches." CASTANEDA then stated, "if he puts an order in for like 10 of them… I can talk to my guy and get them for like $280 or $275, then I'll charge ya'll $325 and ya'll can make a buck fifty [$150]." CASTANEDA further stated, "I'll talk to him see what he says… if anything we can meet over in Indiana so he don't have to cross state lines with those bitches." CASTANEDA then exited the UCV and UC-1 departed the area.

37. Law enforcement agents recovered the seven suspect machine gun conversion devices that have been submitted for analysis.

**E. CASTANEDA Does Not Possess a Valid Federal Firearms License to Sell Firearms**

38. A Federal Firearms License is a license in the United States that enables an individual or a company to engage in a business pertaining to the manufacture or importation of firearms and ammunition, or the interstate and intrastate sale of firearms.

39. On or about 3/31/2023, it was determined through a check of Federal Licensing System that, at the time of the above-described firearms transactions, CASTANEDA did not possess a Federal Firearms License.

FURTHER AFFIANT SAYETH NOT.

Samuel Brienzo by MV
SAMUEL BRIENZO
Special Agent
Bureau of Alcohol, Tobacco, Firearms & Explosives

SWORN TO AND AFFIRMED by telephone March 31, 2023.

Honorable MARIA VALDEZ
United States Magistrate Judge

17